SMITH v. STACEY.

(Supreme Court, Appellate Division, Fourth Department. January 7, 1902.)

1. BOUNDARIES—VISIBLE LINE OF STREET—DESCRIPTION.
    A description in a series of conveyances ran: "Thence westerly, on a line parallel with G. street, and 60 feet therefrom; * * * thence along the northerly line of G. street to place of beginning." As located and occupied, the lot, at one corner, extended 13 feet into the street as located on early maps; the owners building a house with its lines parallel with the visible line of the street, and terracing and platting the lawn with reference thereto. The sidewalk and trees in the street accorded with the visible line, which had existed unchanged for over 40 years. The grantees exercised ownership only 60 feet from the visible street line, and grants of the adjoining lot described it as bounded by the line of the first lot, which, as given, was a trifle longer than the opposite line, indicating that they were not parallel. *Held*, that the description bounding the first lot on the street referred to the visible line of the street, and the owner was not entitled to extend his lot over the adjoining lot to an amount equal to the encroachment on the street.

2. SAME—PRESUMPTION.
    Parties taking title to a lot bounded by a street will be presumed to do so with reference to the visible line of the street, rather than its line on the plat.

3. SAME—PAROL EVIDENCE TO SHOW PRACTICAL LOCATION OF STREET.
    Where a deed is bounded on the line of a street, parol evidence is admissible to show the practical location of the street.

4. SAME—ESTOPPEL.
    Where the purchaser of a lot went into possession, and erected a house and terraced his lawn in recognition of lines located by his predecessor, he cannot, in an action over the boundary, object that evidence as to such location by his predecessor is incompetent, as not binding on him.

Appeal from judgment on report of referee.

Action by George L. Smith against Frank F. Stacey. From a judgment for defendant, plaintiff appeals. Affirmed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

A. M. Mills, for appellant.

John D. Beckwith, for respondent.

SPRING, J. This action involves a small gore of land claimed by both parties, who are owners of contiguous lots in the city of Little Falls. Both lots were in a plat of land which is bounded on the north by Burwell street, on the east by Waverly Place, on the south by Garden street, and on the west by Salisbury street. In 1841 John Ward, who then owned this entire tract, conveyed it to Solomon Petrie and three others; and in 1845 the title of the whole tract was vested in Petrie, who may therefore be deemed the common source of title of the respective parties to this action. By deed of conveyance dated August 4, 1896, Mary Arnold Petrie, who owned both of these lots, and, in fact, the easterly half of the tract referred to, conveyed the southeasterly lot to Michael J. Fisher; and this title came to the plaintiff through mesne conveyances by deed dated October 21, 1899. The description in these conveyances begins at the northwest intersection of Garden street with Waverly Place, running "thence northerly, along the westerly side of Waverly Place, sixty feet; thence westerly, on a line parallel with Garden street and sixty feet distant therefrom, to lands of John P. Harvey; thence southerly, along the easterly line of said Harvey's land, sixty feet, to the northerly line of Garden street; thence along the northerly line of Garden street to the place of beginning." By this conveyance, therefore, the plaintiff acquired title to the lot in the southeasterly part of the tract, 60 feet in width, and extending westerly to Harvey's lot. By deed bearing date May 1, 1899, Mary A. Petrie conveyed to the defendant the lot adjoining that of the plaintiff, with this description:

"Commencing at a point eighty-two and five-tenths (82.5) feet southerly from the intersection of the south line of Burwell street, and the westerly line of Waverly Place, said point being designated by an iron pipe driven into the ground in the said westerly line of Waverly Place; thence northwesterly, at right angles to Waverly Place, and parallel with the south line of Burwell street, about one hundred twenty-eight and six-tenths (128.6) feet, to an iron pipe driven into the ground in the rear line of lots on Salisbury street; thence southwesterly, along said rear line of lots on Salisbury street, to the most northerly corner of the lot sold to one Michael J. Fisher; thence southeasterly, along said Fisher's northerly line, about one hundred twenty-nine and seven-tenths (129.7) feet, to Waverly Place, to an iron rod; thence northeasterly, along the westerly line of said Waverly Place, one hundred (100) feet, to the point of beginning."

The strip in dispute is about 13.55 feet in width on the westerly end, and tapers to a point at the northeast corner at Waverly Place. The early maps of this part of the village of Little Falls show Manheim street, now Garden street, extending from Waverly Place westerly to Salisbury, and its boundary line makes a right angle in its intersection with Waverly Place, and this street line continues directly to Salisbury. Without reciting the evidence in extenso, it may be summed up by saying that it shows, in the early history of the village, that the northerly street line as mapped was without variation. The street, at its intersection with Salisbury, was about 92 feet in width; but the difference from a direct course was all in the southerly boundary. There was apparently no formal laying out.

of Garden or Manheim street. It seems to have been dedicated for street purposes, and was accepted by the village authorities, more than 50 years ago, and regarded from that time as one of the public streets; but whether the dedication and acceptance related to the street as mapped or originally located does not clearly appear.

While the proof is specific as to the map location of this street, it is equally definite and undisputed that in the actual ground location of its northerly boundary the direct map line was not followed. The sidewalk was not on a right angle with Waverly Place, but was parallel with the boundary line, which the defendant claims makes the division between his lot and that of the plaintiff. The row of trees which was planted along the street between the sidewalk and the traveled part of the highway was in recognition of the actual street line, and for half a century the entire location of the boundary on the ground was in disregard of the map line. The sidewalk as originally laid follows out the located line, and from an early period has remained unchanged, although the street retained the width of about sixty feet. The petition for opening and working this street in 1845, and the early resolutions pertaining to it by the village trustees, do not aid us much in determining whether they related to the street as it existed in fact or to that on the map filed. On May 4, 1863, an ordinance was adopted by the board of trustees of said village, referring to Garden street, with others, as "having been laid down on public maps of the village and having been dedicated to public use, are hereby declared to be public streets and highways." Garden street, in this ordinance, is described as 60 feet in width, except at Salisbury street, and "contracted by straight lines" to that width again 120 feet east from Salisbury. The street was then in use, and for many years had been opened, worked, and traveled as at present. So far as the proof shows, the use of the street as far back as the recollection of living witnesses extends was as now, and apparently it was never used in conformity to the map lines. After the adoption of the ordinance of 1863 there was no change in the street, and no attempt was made to extend the northerly boundary to embrace the land, which was occupied as a part of the Petrie premises. The ordinance seems to have been founded only on the maps, and ignored the actual user of the street. It was probably intended by it to make the acceptance as broad as possible, even though of no practical utility to its full extent.

The original deed from Ward in 1841, as well as those of 1845, described the lots "as laid out on the late map of said village." There was no conveyance from Solomon Petrie of the easterly half of this tract; but the title passed along to Mary Arnold Petrie by devise or descent, without description. Solomon Petrie, however, conveyed the westerly parcels in the plot without reference specifically to any map or to any lots thereon. Mary Arnold Petrie became the owner of the easterly half of the plot about 1874, and continued to own it all until the conveyance to Fisher in 1896. During her ownership there were no division fences in the lot, and none were erected after Fisher acquired title. The proof, however, shows that at the time he purchased corners were established and designated by

iron posts in accordance with the street line as actually located, and the northerly line was fixed as claimed by the defendant until this controversy arose. Fisher, after his purchase, erected a house on the lot, and its lines are parallel with the street line as located on the ground, and his occupancy extended to the sidewalk on the northerly line of Garden street. When the present plaintiff became the owner, he enlarged the house, following out the same plan, and terraced and platted his lawn, also to the walk. Fisher and his successors in title extended their dominion northerly no further than 60 feet from the street line as actually established on the ground, and when the defendant came into ownership he followed his predecessors in title by occupying the disputed territory, and was in the actual possession when the plaintiff made his purchase. The deed of the plaintiff, and also those of his predecessors, run from Waverly Place westerly to the lot of John P. Harvey. If this is a direct line, parallel with the map line of Garden street, it would extend northerly beyond the Harvey premises. There is a barn on the northeasterly corner of Harvey's lot, and it is within six inches of a barn owned by his neighbor on the north. At the point where the defendant claims the division line between the plaintiff and himself strikes the Harvey line, a large nail is driven into the barn. These barns made visible monuments which would be apt to attract the attention of a person interested in this disputed boundary line. The deed to the defendant, in its description, makes the southerly line of the tract purchased a trifle longer than its northerly boundary, indicating that they are not parallel lines, and the description in fact may include the disputed strip.

We have, therefore, this condition presented: The map line recognized in the original conveyances, showing a tract rectangular in form, embracing the disputed piece with the street boundary at right angles with Waverly Place, and the disregard of this line in the original location of the street and its use and occupancy by the contiguous owners to the extent of the triangular shaped piece in question, apparently with the assent of the public authorities, who never used the street as mapped. The rule seems to be well established that the parties will be assumed to have acquired title with the visible street boundaries in mind, rather than those laid out on a map. Barrows v. Webster, 144 N. Y. 422, 39 N. E. 357; Burke v. Henderson, 54 App. Div. 157, 66 N. Y. Supp. 468; Blackman v. Riley, 138 N. Y. 328, 34 N. E. 214; Singer v. Mayor, etc., 47 App. Div. 42, 62 N. Y. Supp. 347.

In Barrows v. Webster, supra, the controversy arose over a strip of land situate in the village of Olean, in the county of Cattaraugus, 12 feet in width, claimed by adjacent proprietors. In 1836 Gosseline made a map of the city, and delineated on it Union street, which was then, and since has been, the main business street of the village. That map has ever since been recognized as the official map of the village, as well as of the present city. The street was never opened or traveled to the width delineated on the map, and its boundaries were apparent at the time the respective owners in the action became vested with their holdings. The referee found

as a fact that the parties purchased with reference to the visible boundaries, and that decision was upheld. Burke v. Henderson, supra, involved also the Gosseline map, and the location of the westerly boundary of Union street. The conveyances described the plot "according to a map made by T. J. Gosseline." A recent survey of Union street had been made for paving purposes, and the boundary of the street had been located 11 feet further west, and the plaintiff's lot was therefore abridged to that extent. He thereupon claimed that the boundary line of Union street was that laid down on the Gosseline map, which had long been the official map and survey of the entire village or city. The referee, after disagreeing with the contention of the plaintiff, says in his opinion, which was adopted by this court, at page 163, 54 App. Div., and page 471, 66 N. Y. Supp.:

"But, even if the map is read into the deed, it does not help the plaintiff, because, if the map of the street is different from the street line as actually opened and used, the latter, as between Dean and Rhodes and Lyon, must control. This is a well-settled rule."

In Blackman v. Riley, supra, a like controversy was up over a strip of land claimed to be a part of the old Bloomingdale road, running northerly out of New York City, and which had been originally four rods in width, and laid out as early as 1703. One question much controverted was whether, in 1809, at the time of one of the conveyances by a common grantor, the road was more than two rods in width, which the court settled in the negative; but, in considering the effect of the highway, if laid out the full width, but not used beyond two rods, the court say, at page 332, 138 N. Y., and page 217, 34 N. E.:

"If, however, the legal width may have been four rods, if the road was only used, worked, and repaired to the width of two rods, and the other two rods, so far as visible boundaries are concerned, were a portion of the abutting land, we think a description of the land as bounded by the east side of the road should be construed to mean the visible road as in actual use, and not the ideal road of a width of four, instead of two, rods."

In Singer v. Mayor, supra, the question was whether a fence established the boundary, or whether it was indicated by imaginary lines. The court, after stating that artificial monuments are controlling, adds, at page 45, 47 App. Div., and page 349, 62 N. Y. Supp.:

"In the application of that rule, it has been held that, where a highway is mentioned as a boundary of land, it means the highway as it exists and is open, and not the highway as it may be laid out on a map."

The general rule is thus enunciated in 4 Am. & Eng. Enc. Law, (2d Ed.) p. 815:

"Where a street is described as a boundary, it must be construed as meaning the street as actually opened up and in use, rather than as it was originally located, if there has been any change made in its line."

In the present case the referee found that the northerly boundary of Garden street had existed unchanged "for 40 years and more," and that the deed from Miss Petrie to Fisher "conveyed such premises to, and bounded them on the south by, the visible boundary line of said Garden street as located and used, * * *

and that the deed of conveyance　*　*　*　was given and accepted with reference to the original visible location of Garden street as used and located at the time of such transfer." This finding is well sustained by the evidence, and is within the settled principle of law adverted to.

On the trial the defendant was permitted to prove under objection the facts upon which the practical location rested. The plaintiff contends that evidence of this character tends to vary the conveyance. The deeds were bounded on the northerly line of Garden street, and the evidence received was to aid in the location of that boundary line. That class of proof was admitted in each of the cases cited, and it is not to contradict the deed, but to clear up an obscurity.

It is also urged that the evidence of the location of the line by Fisher and his grantor, Miss Petrie, in conformity with the existing street line, was incompetent to bind the present plaintiff. The lot corners were set, and Fisher went into possession, began the erection of his house, and trimmed up his lawn, all in recognition of this agreement and the location of the boundary lines. It was proper for these parties to establish the line, either by the street line as delineated on the map, or as located on the face of the ground; and, once adjusted, it would, like the settlement of a disputed boundary line, estop the parties and their successors. Vosburg v. Teator, 32 N. Y. 561; Wood v. Lafayette, 46 N. Y. 484. If the conveyance is obscure, and fails to disclose the real intent of those parties to it, the parol declarations and the acts of the parties are admissible. Harris v. Oakley, 130 N. Y. 1, 28 N. E. 530. All of this class of proof is received, not to vary the conveyance, but in aid of it, and to dissipate its uncertainty; and a boundary, once located and openly adhered to by contiguous owners, cannot be disturbed and re-laid by a subsequent owner. The judgment should be affirmed, with costs and disbursements to the respondent.

Judgment affirmed, with costs and disbursements to the respondent. All concur.